United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Thomas Davis, Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 22-23715-Civ-Scola |
| | ) |
| Miami-Dade County, Defendant. | ) |

### Order on Defendant's Motion for Summary Judgment

Plaintiff Thomas Davis brings this action against his former employer, Defendant Miami-Dade County, following his termination. (Am. Compl., ECF No. 18.) Davis complains the County discriminated against him, as a white male, then in his late fifties, when it terminated his employment and allegedly replaced him with his 32-year-old, Black male subordinate. (*Id.*) In his complaint, Davis sets forth four counts: race-based claims under Title VII of the Civil Rights Act of 1964 and the Florida Civil Rights Act (counts one and three); and age-based claims under the Age Discrimination Employment Act and the FCRA (counts two and four). (*Id.*) Previously, the Court granted the County's motion to dismiss, determining Davis failed to allege sufficient facts to state a claim. (Order Granting Mot. to Dismiss, ECF No. 32.) Davis appealed and the Eleventh Circuit Court of Appeals concluded that the Court erred, finding Davis's allegations sufficient to "suggest intentional discrimination." *Davis v. Miami-Dade Cnty.*, No. 23-12480, 2024 WL 4051215, at *4, 6 (11th Cir. Sept. 5, 2024). Accordingly, the Eleventh Circuit reversed and remanded this case for further proceedings, consistent with its opinion. *Id.* at *1.

The County now seeks summary judgment on all of Davis's claims (Def.'s Mot. for Summ. J., ECF No. 54; Def.'s Stmt. of Facts, ECF No. 53), to which Davis has responded (Pl.'s Resp., ECF No. 61; Pl.'s Stmt. of Facts, ECF No. 60). The County has timely replied (Def.'s Reply, ECF No. 65; Def.'s Reply Stmt. of Facts, ECF No. 64) and the issue is now ripe for review. After careful review, the Court **grants** the County's motion for summary judgment (**ECF No. 54**), **in part**, as to Davis's federal claims (**counts one and two**), finding Davis has failed to make a showing sufficient to permit a reasonable jury to find the County intentionally discriminated against him. The Court **dismisses** Davis's remaining state-law claims of discrimination (**counts three and four**), **without prejudice**, declining to exercise supplemental jurisdiction over them.

### 1. Background[1]

On June 26, 2017, the County hired Davis, a white male and then fifty-six years old, as the Board of County Commissioners ("BCC") Director of Policy and Legislation. (Def.'s Stmt. ¶ 5.) His duties included preparing reports and conducting research for the County Commission. (Pl.'s Stmt. ¶ 48.) Initially, Davis reported to supervisors who filled the Commission Auditor role in acting or interim capacities. (Def.'s Stmt. ¶¶ 7, 12.) In December 2018, however, Adeyinka Majekodunmi, a Black male, was appointed Commission Auditor and became Davis's supervisor, beginning in January 2019. (*Id.* ¶¶ 11, 12.)

Just over a year after Majekodunmi assumed his supervisory position, in February 2020, he summoned Davis to a meeting and notified him he was being removed from his position. (*Id.* ¶ 36.) During that meeting, Majekodunmi told Davis he "was not living up to his vision." (*Id.* ¶ 37.) Davis was not provided with any other reasons for his termination during that meeting. (Pl.'s Stmt. ¶ 56.) Majekodunmi also called security to be present at the meeting because he felt Davis displayed antagonistic behavior. (Def.'s Stmt. ¶ 38.) Davis counters that he was not antagonistic, and there was no reason to call security. (Pl.'s Stmt. ¶ 38.) Davis was 58 years old when he was fired. (Pl.'s Resp. at 12; Pl. Dep. 8:9, ECF No. 52-1.)

At the time of his dismissal, no reference to Davis's age or race was made nor did Davis believe, then, that the reason he was being fired was because of his age or race. (Def.'s Stmt. ¶¶ 40–41.) It was not until later that Davis thought "the premise of the meeting was a lie" (Pl.'s Stmt. ¶ 41), alleging in his May 2020 Equal Employment Opportunity Commission charge that the County had discriminated against him on the basis of his age and race (Def.'s Stmt. ¶ 45).

Davis was never issued any formal written warnings and says he was never disciplined or counseled during the entire time he was employed by the County. (Pl.'s Stmt. ¶ 49; Pl.'s Aff. ¶ 2, ECF No. 59-14.) And, although the County had a policy of evaluating staff annually, in his over two-and-a-half years there, Davis never received an evaluation or any written goals. (Pl.'s Stmt. ¶¶ 50, 51.) Davis also insists that he treated Majekodunmi respectfully; never displayed a negative attitude or raised his voice in meetings with Majekodunmi; and never displayed any antagonistic behavior. (Pl.'s Aff. ¶¶ 3, 4; Pl.'s Stmt. ¶¶ 33.)

After Davis's termination, Majekodunmi requested a 5% base salary increase for Phillip Edwards—a thirty-one-year-old Black male who had been Davis's subordinate—retroactive to the day Davis was fired. (Pl.'s Stmt. ¶ 42.)

---

[1] Unless indicated otherwise, the facts presented below are undisputed.

In a memo justifying the increase, Majekodunmi described Edwards's new role as being "responsible for the operation and supervision of all staff in the legislative section of [the Office of the Commission Auditor] in an immediate acting role due to the vacancy of the Policy and Legislation Director." (*Id.* ¶ 42; Pl. Stmt., Ex. 5, ECF No. 52-5, 37.) Then, in August 2020, Edwards was promoted to the position of Legislative Research Manager. (Pl.'s Stmt. ¶ 42; Pl. Stmt., Ex. 5 at 38.)

Although Davis maintains he was never insubordinate, on several occasions, throughout 2019, he failed to comply with various instructions or directives that Majekodunmi had issued. (Def.'s Stmt. ¶¶ 19–21, 27–29, 31–32.) Several of these incidents were memorialized in emails from Majekodunmi to Davis. (*Id.* ¶¶ 19–21, 27.) For example, despite Majekodunmi's telling Davis not to, Davis included repetitive language in his reports and sent out reports without Majekodunmi's prior approval. (*Id.* ¶ 19, 21, 26–27.) Davis also failed to complete research projects that had been assigned to him. (*Id.* ¶ 20.) In June 2019, when Majekodunmi noticed that no work items had been assigned to Davis, Edwards told Majekodunmi it was because Davis has told Edwards, contrary to Majekodunmi's directive, not to allocate any projects to him. (*Id.* ¶ 24–25.) Davis denies having ever told Edwards to do that, but there is no indication that, at the time Davis was fired, Majekodunmi was ever aware of this discrepancy. (Pl.'s Stmt. ¶¶ 24–25, 55.)

In yet another instance, when requested to do so, Davis refused to provide a statement to Majekodunmi about Davis's alleged involvement with improperly discarding audit files in 2018. (Def.'s Stmt. ¶¶ 30–32.) Another County employee, Luis Carrazana (described as Hispanic and approximately Davis's age), either told Majekodunmi that he had witnessed Davis disposing of the files or that a coworker had told him about the incident. (*Id.* ¶¶ 30; Pl. Dep. at 123:25.) In the course of investigating those allegations, Majekodunmi demanded that Davis provide a written statement about the accusation. (Def.'s Stmt. ¶31.) Davis refused to do so, insisting he would comply only if Majekodunmi provided him with more information or evidence regarding the incident. (*Id.*) Although Davis admits he didn't provide a written statement, he denies that he ever discarded the files. (Pl.'s Stmt. ¶ 30.) Davis also points out that there is conflicting evidence about witness accounts of the incident in 2018: Majekodunmi said Carrazana reported personally witnessing Davis discard the files while Carrazana himself testified that another employee had told Carrazana that she had witnessed it. (*Id.* ¶¶ 30–31, 58–60.)

Lastly, although Majekodunmi never reported to anyone that Davis was ever violent or aggressive, Majekodunmi nonetheless says that Davis was

"disrespectful in his discourse" towards him, had a negative attitude, and raised his voice. (*Id.* ¶¶ 33, 34, 39; Def.'s Stmt. ¶¶ 33, 34.)

### 2. Legal Standard

The Court applies the familiar legal standard for summary-judgment motions. "Summary judgment is appropriate where the pleadings, affidavits, depositions, admissions, and the like show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015) (cleaned up). "[T]o survive summary judgment, the nonmoving party must . . . make a showing sufficient to permit the jury to reasonably find on its behalf." *Id.* "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir.2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

### 3. Analysis

The County moves for summary judgment on all four of Davis's claims—(1) race discrimination under both Title VII of the Civil Rights Act of 1964 and the FCRA (counts one and three); and (2) age discrimination under both the ADEA and the FCRA (counts two and four).[2] According to the County, Davis's discrimination claims fail because (1) he is unable to establish his prima facie case under the framework set forth in *McDonnell Douglas*[3] as to either his age or race claims; (2) even if was able to make out that prima facie case, he has not overcome the County's proffer of several legitimate reasons that justify Davis's termination; and (3) aside from the *McDonnell Douglas* framework, he has not otherwise carried his burden of identifying circumstantial evidence sufficient to allow a jury to infer unlawful discrimination. (Def.'s Mot. at 12–17; Def.'s Reply at 2–10.) In opposition, Davis points to evidence he says not only establishes a prima facie case of discrimination, but that also sufficiently lays out a "convincing mosaic of circumstantial evidence that would allow a jury to

---

[2] As explained more fully below, because the Court ultimately finds summary judgment warranted on Davis's two federal claims, it declines to exercise supplemental jurisdiction over his remaining state-law claims.

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

infer intentional discrimination." (Pl.'s Resp. at 12–14.) Davis also maintains he has produced evidence undermining the County's proffered reasons for his termination, establishing that those reasons were mere pretext for the County's illegal discrimination. (*Id.* at 15–18.) After careful review, the Court finds summary judgment warranted because Davis has failed to carry his burden of identifying enough evidence that would ultimately allow a reasonable jury to infer intentional discrimination.

"Discrimination claims—whether they are brought pursuant to Chapter VII, § 1981 or the ADEA—are analyzed in the same manner." *Pope v. Park Springs, LLC*, No. 1:22-CV-01395-JPB, 2024 WL 4063558, at *2 (N.D. Ga. Sept. 5, 2024). Without direct evidence of discrimination—which is not at issue in this case—Davis must rely on circumstantial evidence to prove his discrimination claims. No matter whether the evidence is viewed through the lens of the burden-shifting framework developed in *McDonnell Douglas*, the so-called convincing-mosaic approach, or some other vehicle used to marshal the presentation of evidence, an employee aiming to ward off summary judgment must, in the end, simply present enough "circumstantial evidence that would allow a jury to infer intentional discrimination." *Scott v. Macon Bibb Cnty. Georgia*, No. 24-11388, 2025 WL 1905365, at *3 (11th Cir. July 10, 2025).

### A. *McDonnell Douglas* Framework.

One of the ways Davis attempts to prove his case is through the *McDonnell Douglas* burden-shifting framework. Under this framework, a plaintiff must first set forth a prima facie case of discrimination. With respect to his age-discrimination claim, Davis has to show (1) he was at least forty years old at the time he was terminated; (2) he was qualified for the position he held; (3) he was subjected to an adverse employment action; and (4) he was either replaced by a younger employee or was treated less favorably than younger employees who were "similarly situated." *Horn v. United Parcel Services, Inc.*, 433 F. App'x 788, 792 (11th Cir. 2011). The evidence Davis needs to establish his prima facie race-discrimination case is similar: he must show (1) he belongs to a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the position he held; and (4) he was replaced by someone outside his protected class or treated less favorably by his employer than "similarly situated" employees outside his protected class. *Bowens v. Escambia Cnty. Bd. of Educ.*, No. 22-11560, 2023 WL 4145424, at *2 (11th Cir. June 23, 2023). For both claims, a prima facie case establishes "a presumption of unlawful discrimination against the employee." *Id.* Once the presumption is established, the burden then shifts to the employer to "rebut that presumption by articulating legitimate, nondiscriminatory reasons for the

adverse employment acts." *Id.* Finally, if the employer is successful, the burden shifts back to the employee "to produce evidence sufficient to create a genuine issue of material fact that the employer's articulated reasons are a pretext for unlawful discrimination." *Id.* After careful review, the Court finds Davis has likely satisfied his minimal burden of establishing his prima facie case but has failed to identify evidence supporting his claim that the County's proffered reasons for his termination are really just pretext for unlawful race or age discrimination.

### (1) Davis has established a prima facie case under *McDonnell Douglas.*

There is no real dispute as to the first three elements of each prima facie case: Davis, at the time he was fired, was over forty and white; his employment was terminated; and it appears he was qualified for his position. Instead, the parties' quarrels as to Davis's discrimination claims center on the fourth element of each respective prima facie case: whether Edwards—Davis's Black subordinate who was some twenty-five years Davis's junior—replaced Davis upon his termination.

As the County views it, Davis could not possibly have been replaced by someone outside his race or by someone substantially younger because Davis's position was never filled at all upon his termination. (Def.'s Mot. at 12, 13–14; Def.'s Reply at 1–2.) In support, the County points to (1) Davis's own testimony that his position—the BCC Director of Policy and Legislation—"was not filled" (Pl. Dep. at 169:9–10); (2) Majekodunmi's testimony that Davis's position "was abolished after he was terminated," that Majekodunmi handled Davis's duties involving managing external communications and relationships, and that Davis's various projects were distributed across the research team (Majekodunmi Dep. at 163:12–13, 20–23, ECF No. 52-4); and (3) Edwards and Majekodunmi's testimony that Edwards's duties remained the same after Davis's termination, with Edwards's continuing to supervise the same group of people when he was promoted to senior research manager in August 2020, as he did when he worked as a senior research analyst, before that (Edwards Dep. at 18:17–21, 20:7–18, ECF No. 52-3; Majekodunmi Dep. at 203:7–8). In opposition, Davis draws attention to a memorandum that Majekodunmi issued to the BCC Operations Manager, in May 2020 (three months after Davis's February termination). (Pl.'s Resp. at 13.) In that memo, Majekodunmi requested a 5% salary increase for Edwards, retroactive to February, explaining that, since Davis's termination, Edwards had been "responsible for the operation and supervision of all staff in the legislative section . . . in an immediate acting role due to the vacancy" created by Davis's departure. (May 2020 Mem., ECF No. 52-5, 37.) Additionally, Davis highlights Edwards's own

testimony that the County "reclassified [Davis's] position" and ultimately appointed Edwards to a "downgrade[d]" version of it. (Edwards Dep. at 71:15–19.)

The Court finds the evidence Davis points to likely sufficient to introduce a genuine issue of material fact as to the fourth element of his prima facie case. As a starting point, the Court does not find it necessarily dispositive that the County did not promote Edwards into Davis's exact title and position. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987) (recognizing that even where a plaintiff's position is "restructured and relabeled," and even if some of the plaintiff's duties are redistributed to various other employees, a plaintiff can still establish that he was replaced by an employee outside of his protected class); *Vahey v. Philips Elecs. N.A. Corp.*, 461 F. App'x 873, 875 (11th Cir. 2012) (noting that "a plaintiff may demonstrate that he was replaced when another employee assumes the plaintiff's responsibilities in addition to their own responsibilities after the plaintiff is terminated"). In addition, the County's own memo—describing Edwards as taking over responsibilities in an "acting role," as a result of Davis's termination—is at odds with Edwards and Majekodunmi's testimony that, post Davis's departure, Edwards's position and duties were unchanged. Though not overwhelming, the Court finds this sufficient, especially in light of a plaintiff's "low bar to hurdle," in establishing a prima facie case, to raise a genuine issue of material fact as to whether Davis was replaced by someone younger, as well as outside Davis's race. *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015).

### (2) **The County has proffered legitimate, non-discriminatory reasons for Davis's termination.**

Assuming Davis has met his burden of establishing his prima facie case (and it appears he has), the Court turns to the County's proffer of several legitimate, nondiscriminatory reasons that it says prompted Davis's termination. According to the County, Davis's termination resulted from what the County describes as Davis's antagonistic, insubordinate, and disrespectful behavior towards Majekodunmi, evidenced by several incidents where Davis failed to follow Majekodunmi's instructions, directives, or demands. (Def.'s Mot. at 12–13.) More specifically, for example, Davis sent out emails and other documents without Majekodunmi's approval, which he was explicitly directed to obtain, and without fixing language he was told to fix. (Def.'s Stmt. ¶¶ 19, 21, 26, 27, 28.) Similarly, Davis failed to complete certain research tasks assigned to him through an April 2019 work-allocation plan. (*Id.* ¶¶ 17, 20, 23.) In fact, two months later, Edwards reported to Majekodunmi that, in direct defiance of Majekodunmi's directive, Davis told Edwards not to assign similar

research items to him on the June work plan. (*Id.* ¶ 25.) The County also says Davis refused to provide a statement about a 2018 incident, involving the improper disposal of audit files, that Majekodunmi was investigating in 2019 and early 2020. (*Id.* ¶¶ 30–32.) Finally, Majekodunmi maintains he felt Davis generally had a "negative attitude," was insubordinate and "disrespectful in his discourse," and would "raise[] his voice" during meetings where he was criticized. (*Id.* ¶¶ 33–34.)

Davis does not dispute that the County has proffered legitimate reasons for his termination, thus rebutting his prima facies case. Certainly, the County's account of Davis's repeated insubordination and performance issues—if true—could reasonably justify the County's firing him. Accordingly, the County's proffer, and the evidence identified supporting its proffer, is "sufficient to dispel any presumption created by [Davis's] prima facie case and shift the burden back to [him] to demonstrate that this explanation was simply a pretext for unlawful discrimination." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1323 (11th Cir. 2023).[4] The Court finds Davis fails to carry this burden, as set forth below.

### (3) Davis's fails to discredit the County's proffers or show that the proffers were fabricated to cover up intentional discrimination.

"To establish pretext, an employee must cast sufficient doubt on the employer's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that they were not what actually motivated its conduct." *Phillips*, 87 F.4th at 1323–24 (cleaned up). To do this a "district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*,

---

[4] As an aside, the Court does not consider the County's subjective characterizations—that Davis had a negative attitude, was disrespectful in his discourse, and raised his voice when criticized—in its pretext analysis. This does not mean the Court finds those proffered reasons pretextual, or false; it just means the County has not "articulate[d] clear and reasonably specific factual bas[e]s upon which it based its subjective opinion[s]," rendering them insufficiently supported by the record to be considered in sustaining the County's motion for summary judgment. *Springer v. Convergys Customer Mgt. Group Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007). Conversely, Davis's mere disagreement with Majekodunmi's generalized characterization of Davis's behavior, also without any supporting specific factual bases, does not amount to a showing of pretext. *See id.* ("Absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based [an employment] decision on purely subjective criteria will rarely, if ever, prove pretext."). In other words, neither side's reliance on subjective criteria alone moves the needle in either direction.

106 F.3d 1519, 1538 (11th Cir. 1997). The Court finds Davis has failed to do so.

In seeking to undermine the County's proffered reasons for his termination, Davis argues (1) the County's explanations for firing him have shifted since his termination; (2) Majekodunmi's statement, at the time of his termination, that Davis was not meeting his "vision" for the office is "insufficient and questionable"; (3) the County's description of Davis's not finishing his work, not complying with Majekodunmi's directives, and otherwise being disrespectful is disputed; (4) the County's version of events regarding the discarded audit files are disputed; (5) other employees were insubordinate but were never disciplined; (6) the County's version of Edwards's removing Davis from the work-allocation list is disputed; (7) the County failed to follow its own policies in that it didn't afford Davis an opportunity to address any alleged deficiencies like it did for other employees and Davis was never disciplined for any deficiencies; and (8) contrary to County policies, Davis never received an annual evaluation like other employees did. The Court is not persuaded that these issues, whether considered together or isolation, could lead a reasonable factfinder to conclude the County's proffered legitimate reasons are unworthy of credence or that they are mere cover for unlawful discrimination.

First, the Court finds Davis's criticism about the only reason given to him at the time of his termination—that he wasn't meeting Majekodunmi's "vision"—and the purportedly shifting reasons the County proffers now, in litigation, unavailing. To begin, while it is true that not meeting Majekodunmi's vision was the only reason the County provided when it fired him, the County has since specified several underlying factors that motivated its decision, including instances of Davis's performance falling short and disobeying Majekodunmi's explicit orders. Accordingly, although it's possible that, in a vacuum, not meeting Majekodunmi's "vision" "could've meant that [Majekodunmi] had a plan for how the office would run and he didn't see Davis as a part of that ideal office . . . because of his race or age," Davis fails, now, to identify record evidence that would support that inference. *Davis*, 2024 WL 4051215, at *5. In other words, to the extent Davis banks on just the existence of Majekodunmi's statement—that Davis was not meeting his "vision"—to support his contention that the County's proffered reasons are mere pretext, he falls short: "there [are] many meanings behind the term [and] it can be applied in various ways." *Id.* The use of the term itself does not render the other reasons now proffered pretextual. In fact, the record evidence supports a contrary inference. That is, to the extent the legitimate reasons the County now proffers, justifying Davis's termination, are not shown to be pretext, they

support a more benign interpretation: that Davis didn't meet Majekodunmi's "vision" for the office because of performance issues and insubordination.

In the same vein, Davis's characterization of the County's proffered reasons for his termination as "shifting," without any analysis, is unconvincing. (Pl.'s Resp. at 17.) Davis fails to explain how the County's proffered performance and insubordination reasons are at odds with being told he wasn't meeting Majekodunmi's vision when he was terminated. This case is a far cry from the cases Davis relies on where testimony revealed that the employers' proffered reasons, in litigation, were diametrically at odds with the reasons those employers had given prior to litigation. *E.g., Bechtel Const. Co. v. Sec. of Lab.*, 50 F.3d 926, 935 (11th Cir. 1995) (where an employer told an administrative law judge that an employee was *not* dismissed because of his job performance or arthritis but because of his "gung ho nature"; and then later, during the relevant litigation, said just the opposite—that the employee was terminated because of his poor job performance which was exacerbated by his arthritis); *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1307 (11th Cir. 2012) ("[T]he corporate executive who terminated the plaintiff for alleged misconduct later said that the plaintiff was an exceptional employee who had done nothing wrong, had done everything right, and should not have been fired.").

Davis next maintains that he has sufficiently disputed all the County's alleged incidents of insubordination. (Pl.'s Resp. at 17.) This is simply not true. First, there is no dispute that Majekodunmi issued a directive, shortly after becoming the Commission Auditor, that work product for the research team should not be published from the office without his prior approval. (Def.'s Stmt. ¶ 15; Pl.'s Stmt. ¶ 15.) There is also no real dispute that, despite this directive, Davis, more than once, sent out documents, without Majekodunmi's prior approval. (Def.'s Stmt. ¶¶ 21, 26, 27, 28; Pl.'s Stmt. ¶¶ 21, 26, 27, 28.)[5] Davis's suspicion that he might not have received Majekodunmi's November 2019 email, asking why "all the special reports were sent to the commissioners before [his] approval," does not amount to evidence that Majekodunmi did not actually send it. Nor does Davis's testimony, that the email "doesn't smell

---

[5] Davis asks the Court to strike four November 2019 emails, from Davis to various commissioners, attaching reports, that the County appended to Majekodunmi's affidavit in support of the County's motion for summary judgment. Davis complains these documents were never produced during discovery and therefore should be excluded from the Court's review. These emails simply bolster Majekodunmi's otherwise unrebutted testimony—that Davis published reports to commissioners without Majekodunmi's prior approval. Davis also does not deny sending the emails though he implies he could have gotten approval before sending them out. Regardless, because the Court's decision does not turn on these four emails (Majekodunmi Aff., Ex. A, ECF No. 52-6, 4–7), the Court denies Davis's request as moot.

right," without more, allow the Court to infer that the email is not legitimate. *See U.S. v. Dowdell*, 595 F.3d 50, 72 (1st Cir. 2010) ("An entirely conjectural and uncorroborated conspiracy theory does not transform an otherwise trustworthy document into an untrustworthy one."). Second, there is also no dispute that Davis failed to heed Majekodunmi's instruction to eliminate redundant language from published office memoranda that repeated language from the "issue" sections in the "analysis" sections. (Def.'s Stmt. ¶¶ 19, 21; Pl.'s Stmt. ¶¶ 19, 21.) Similarly, Davis offers no evidence that controverts the County's complaint that, in April 2019, of all the action items identified on a work allocation list, only Davis's assignments had not been completed. (Def.'s Stmt. ¶¶ 20; Pl.'s Stmt. ¶¶ 20.) Finally, there is no real dispute that Davis, upon Majekodunmi's demand, refused to provide a written statement about the 2018 document-disposal incident that Majekodunmi was investigating. (Def.'s Stmt. ¶ 31.) Davis says he agreed to produce a statement about the discarded files once Majekodunmi provided him with more information about the allegations against him. (Pl.'s Stmt. ¶ 31.) But that is not the same as "never refus[ing] to provide a statement to [Majekodunmi] regarding missing audit files," as Davis characterizes his position. (Davis Aff., ¶ 12, ECF No. 59-14.) That is, a conditional offer to comply does not equate to actual compliance.[6]

On the other hand, though, there is an actual dispute regarding the County's proffer that Davis commanded Edwards, in direct defiance of Majekodunmi's instruction, to remove Davis from the work-allocation plan, in June 2019. Ultimately, however, the Court does not find this dispute material. Edwards and Davis have conflicting accounts of what happened: Edwards says Davis told him to remove Davis from the work plan; Davis maintains that never happened, surmising that Edwards simply made a mistake in leaving him off the list. Viewing that testimony in the light most favorable to Davis, then, the Court assumes, for current purposes, that Davis didn't tell Edwards to leave Davis off the June work-allocation plan. But that still leaves Majekodunmi's contemporaneous understanding of the situation unrebutted: Edwards, in June 2019, told Majekodunmi that Davis had directed Edwards not to assign any work items to Davis on the June plan. Since there is no evidence showing that Davis, or anyone else, ever corrected Majekodunmi's misunderstanding of what had happened, Majekodunmi was left with the impression, mistaken

---

[6] Davis also argues that the record reflects conflicting versions of the allegations surrounding the accusation that Davis discarded the audit files. While there were certainly inconsistencies among the details surrounding the witnessing of the incident—in terms of who saw what, who reported what to whom and when, and so on—there is no evidence that the accusation itself was fabricated by Majekodunmi (or anyone else) or that Majekodunmi had anything other than a genuine interest in investigating the accusation that Davis had improperly disposed of documents.

though it might have been, that this was just a "case of Mr. Davis instructing staff to do the opposite of what [Majekodunmi] directed him to do." (Majekodunmi Dep. 137:5–7.) In other words, even though Majekodunmi may have been misinformed by Edwards about what really happened, that doesn't amount to a showing that the decisionmaker himself wasn't giving "an honest explanation of [his] behavior." *Kragor*, 702 F.3d at 1310–11.

The Court finds Davis's other attempts to undermine the County's proffer of legitimate reasons that it says justified the termination similarly unpersuasive. For example, Davis complains that none of the infractions the County identifies are corroborated by written evidence of disciplinary measures. First, this is not entirely correct—there are several emails from Majekodunmi to Davis in which Majekodunmi calls out a deficiency or incident and directs Davis to take remedial action. (*E.g.*, Def.'s Stmt. ¶¶ 19, 20, 29 (identifying several emails from Majekodunmi to Davis, instructing Davis to correct verbiage that is repeated in the "analysis" section from the "issue" section; opining that "only [Davis's] items were not completed" and that Davis "will have to support [his] team better next cycle"; and asking why various reports were sent to commissioners without first obtaining Majekodunmi's approval).) Second, even if there was no formal "disciplinary paperwork," Davis doesn't explain how this alone amounts to evidence showing that the County's proffered explanations for Davis's termination are unworthy of credence. That is, without more, Davis fails to persuade the Court that it can infer dishonesty from what could be described as nothing more than a shoddy business practice. *See Short v. Mando Am. Corp.*, 601 F. App'x 865, 874 (11th Cir. 2015) (noting that quarreling with an employer's "business judgment and with the company's purportedly subjective reasons for its decision," do not amount to a showing of pretext). Ultimately, "[a]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (cleaned up).

This same analysis applies to Davis's complaints about Majekodunmi and the County's failure to reduce various policies and procedures to writing; and the de minimis nature, as Davis sees it, of Davis's admitted infractions. But again, these arguments amount to nothing more than criticisms of the County's business decisions without tying that alleged lack of professional competence to a lack of honesty. In other words, "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions." *Id.* (cleaned up). This is so regardless of "how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers" may be. To demonstrate pretext a plaintiff must do more,

providing "concrete evidence in the form of specific facts" that the employer's proffered reason was fabricated to cover up the alleged discriminatory reasons animating its decision. *Dent v. Georgia Power Co.*, 522 F. App'x 560, 563 (11th Cir. 2013).

Conversely, Davis's arguments about the County's failure to ever evaluate him or give him opportunities to improve are a little different. As Davis points out, the County has a policy that each staff member should be provided a formal performance at least annually and that employees should be afforded opportunities to improve. But, says Davis, he was not given an opportunity to improve and, unlike, both Edwards and Majekodunmi, Davis was never given an evaluation throughout his entire tenure at the County. Davis argues these deviations are evidence of pretext. While certainly "an employer's deviation from its own standard procedures *may* serve as evidence of pretext," *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) (emphasis), Davis fails to explain why the deviations in this case, combined with the undisputed incidents of insubordination, would be sufficient to support an inference of pretext here. This is so even though both Edwards and Majekodunmi were evaluated. During the relevant period, Majekodunmi was not responsible for Edwards's evaluation, rather Davis himself was. Nor, obviously, was Majekodunmi responsible for his own evaluation. In contrast, Majekodunmi alone was responsible for Davis's evaluation and there is no evidence that Majekodunmi, while he worked with Davis, was evaluating other employees while not evaluating Davis.

Furthermore, there is no record dispute that, despite the County's policy, both Edwards and Majekodunmi's evaluations were issued late. For example, Edwards's evaluation was not issued until February 2019 even though it covered the period ending in July 2018, (Def.'s Stmt. ¶ 44); and Majekodunmi's evaluation was not issued until December 2021, but covered the employment period ending in October 2020 (Pl.'s Index, Majekodunmi Perf. Eval., ECF No. 59-9). In other words, while Majekodunmi's failure to issue an evaluation for Davis may have violated County policy, there is no evidence that Majekodunmi's failure to do so was an aberration as a matter of practice. Indeed, since Davis and Majekodunmi only worked together for just over a year, the Court would be hard pressed to say that Majekodunmi's failure to issue Davis a performance evaluation in that timeframe is evidence of pretext. All in all, the Court finds Davis has failed to tie the deviation from policy, in this instance, to pretext. *Cf. Rojas v. Fla.*, 285 F.3d 1339, 1344 (11th Cir. 2002) ("[A] plaintiff must also show that the deviation from policy occurred in a discriminatory manner.") (cleaned up); *Mitchell v. USBI Co.*, 186 F.3d 1352, 1356 (11th Cir. 1999) (noting "deviation from company policy not evidence of

discrimination, absent a nexus between deviation and employee's protected status"); *Eubanks v. Henry Cnty.*, 626 F. App'x 250, 255 (11th Cir. 2015) ("an employer's failure to follow an employment policy or procedure does not necessarily indicate that an employer's proffered reason was a pretext").

But, even assuming Davis was able to cobble together a showing of some pretext, he has still not come forward with record evidence that such pretext was a cover for unlawful discrimination. "It is not enough, in other words, for [a plaintiff] to prove that [her employer] is lying about the true reason for her termination; to escape summary judgment, she must produce sufficient evidence for a reasonable jury to find that the true reason was discrimination." *Phillips*, 87 F.4th at 1325.

In support of his claim that he was discriminated against, Davis points to instances where he claims other employees were insubordinate, like he was, but were not terminated. For example, he complains that Majekodunmi did not discipline Edwards for removing Davis from the work-allocation plan. But Davis fails to explain why the Court can look to Edwards as a proper comparator. This is especially problematic where there is no dispute that (1) Edwards was Davis's subordinate; (2) as far as Majekodunmi knew, Edwards was simply following directions from his supervisor—Davis—and not intentionally disregarding Majekodunmi's directive; and (3) there is no evidence that Edwards, unlike Davis, had engaged in multiple other incidents of insubordination. So, even though, at this stage, Davis isn't required to establish that Edwards is a strict comparator (as would be necessary, for example, if relying on comparator evidence to establish his prima facie case under *McDonnell Douglas*), Davis nonetheless fails to establish the relevance of Majekodunmi's allegedly disparate treatment of Edwards as compared to Davis.

Davis's reliance on Carrazana as a comparator is even weaker. Davis complains that Carrazana was not disciplined for failing to retrieve the files that he alleged Davis had discarded. But Davis fails to explain how Carrazana's situation is at all relevant to Davis's. Davis also fails to show how Majekodunmi's disparate treatment of Davis, as compared to Carrazana, could be construed as discriminatory when (1) the evidence indicates the two men were about the same age, and (2) there is no evidence establishing Carrazana's race, other than Davis's describing him as Hispanic. Additionally, to the extent Carrazana was arguably insubordinate for failing to retrieve the files he said Davis discarded, Carrazana's position was subordinate to Davis's, the purported insubordination had taken place long before Majekodunmi assumed the position of Commission Auditor, and, like, Edwards, there is no evidence that Carrazana had engaged in all the other incidents, or types of incidents, of insubordination that Davis had. In sum, Carrazana and Edwards are so

dissimilarly situated, as compared to Davis, that Davis's reliance on them as comparators, to show intentional discrimination, in the pretext context. is unavailing.

Nor does Davis establish how a factfinder could infer unlawful discrimination from the evidence supporting his prima facie case. While adequate to meet the first hurdle in the *McDonnell Douglas* analysis, Davis fails to show how that evidence alone would enable a factfinder to infer unlawful discriminatory animus. "Being replaced by someone outside one's protected class can help to establish the prima facie case of discrimination for burden-shifting purposes," "[b]ut it is not enough to carry the day on the substantive question of discrimination." *E.g. Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1019 (11th Cir. 2023). This is especially so here, where there is (1) undisputed evidence of Davis's insubordination; (2) undisputed evidence that, despite Edwards' filling a portion of Davis's role, Edwards continued to supervise the same employees, Majekodunmi took over the role Davis had managing external communications and relationships, and Davis's research projects were distributed across the remaining members of the research team (Def.'s Reply at 2 (citing Majekodunmi Dep. at 163:9–24); (3) undisputed evidence that Davis's exact position was terminated; (4) no evidence that Edwards was unqualified to be promoted into the vacancy created by Davis's departure; and (5) no evidence, other than Davis's suspicions and innuendo, that Edwards or Davis's races or ages played a role in Majekodunmi's decision-making process.

In sum, although Davis arguably made out a prima facie case, under the *McDonnell Douglas* framework, he has failed to identify evidence sufficient to show that the County's proffered legitimate reasons for Davis's termination are fabricated. Further, aside from the evidence supporting his prima facie case, Davis has not identified other evidence from which a reasonable factfinder could infer that the County fired him as a result of unlawful age or race discrimination. *See Bogle v. Alabama L. Enf't Agency*, No. 23-13947, 2024 WL 4635025, at *2 (11th Cir. Oct. 31, 2024) ("A reason cannot be pretextual, however, unless it is shown both that the proffered reason was false and that discrimination was the real reason.").

### B. Davis has failed to otherwise identify record evidence that creates a triable question of unlawful discrimination.

Davis also argues that, outside the *McDonnell Douglas* framework, the record evidence he has identified is enough to introduce a genuine issue of material fact that the County unlawfully discriminated against him. (Pl.'s Resp. at 15.) The Court disagrees.

In addition to, or instead of, proceeding under the *McDonnell Douglas* framework, a plaintiff can simply focus on the "ordinary summary judgment standard," more poetically termed the "convincing mosaic" by courts and parties in the employment-discrimination context. *McCreight v. AuburnBank*, 117 F.4th 1322, 1335–36 (11th Cir. 2024) ("[T]o the extent the term 'convincing mosaic' has become a distraction, we again reiterate that this approach to analyzing the evidence treats an employment discrimination suit in the same way we would treat any other case—jumping directly to the ultimate question of liability and deciding whether the moving party is entitled to judgment at that stage of the case") (cleaned up).

While Davis has set forth evidence from which a factfinder could certainly infer a dysfunctional work environment and poor business practices, he fails to identify, as described in more detail above, evidence that the County's decision to fire him was motivated by discriminatory animus—either as to Davis's age or race. *See Ossmann*, 82 F.4th at 1020 ("[T]he convincing mosaic inquiry is identical to the final stage of the *McDonnell Douglas* framework: both ask whether there is enough evidence for a reasonable jury to infer intentional discrimination."); *Thomas v. Sheriff of Jefferson Cnty., Alabama*, No. 22-13875, 2023 WL 6534602, at *6 (11th Cir. Oct. 6, 2023) (finding no triable issues of discrimination where the plaintiff had failed to identify evidence of other "animus against non-comparators in the plaintiff's protected class"; that "the employer had a reason to discriminate such as to counteract a public perception of leniency"; or that "the [employment] decision was extraordinarily arbitrary").

### C. Supplemental Jurisdiction

Having granted summary judgment in the County's favor on Davis's two federal claims, all that remains, then, of his complaint are his two state-law claims under the FCRA. Once a court disposes of all the claims over which it had original jurisdiction, it may then, in its discretion, decline to exercise supplemental jurisdiction over claims that arise only under state law. Having evaluated this case, and noting that the only federal claims have been disposed of prior to trial, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims. The Court thus dismisses, without prejudice, Davis's FCRA claims as set forth in counts three and four. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Murphy v. City of Aventura,*

383 F. App x 915, 918–19 (11th Cir. 2010) (affirming dismissal of pendent state-law claims after granting summary judgment even where the plaintiff complained that doing so was "unfair" and "work[ed] an injustice by requiring her to begin anew in state court") (cleaned up); *Raney v. Allstate Ins. Co.,* 370 F.3d 1086, 1089 (11th Cir. 2004) ("encourag[ing] district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial"); *Lehman v. Lucom*, No. 11-23479-CIV, 2012 WL 1802435, at *7 (S.D. Fla. May 17, 2012) (Scola, J.), *aff'd,* 727 F.3d 1326 (11th Cir. 2013) (granting the defendant's motion for summary judgment on the federal claims and declining to exercise supplemental jurisdiction over the remaining state claims).

### 4. Conclusion

For the reasons set forth above, the Court **grants** the County's motion for summary judgment (**ECF No. 54**) as to Davis's federal claims of discrimination under Title VII and the ADEA in **counts one and two** of his complaint. The Court declines to exercise supplemental jurisdiction over his remaining state-law claims, in **counts three and four**, and **dismisses them without prejudice**.

The Court directs the Clerk to **close** this case. All pending motions are **denied as moot**.

**Done and ordered** at Miami, Florida on August 14, 2025.

_____
Robert N. Scola, Jr.
United States District Judge